**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Northern Division*

| | | |
|---|---|---|
| IRIS FOSTER, | * | |
| Plaintiff, | * | |
| v. | * | |
| | | Civil Case No.: PWG-10-1933 |
| UNIVERSITY OF MARYLAND | * | |
| EASTERN SHORE, | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

This Memorandum Opinion and Order addresses the Motion for Summary Judgment that Defendant University of Maryland Eastern Shore ("UMES") filed, ECF No. 41, along with a Memorandum in Support, ECF No. 41-1; Plaintiff Iris Foster's Opposition, ECF No. 43; Defendant's Reply Memorandum, ECF No. 45; and Plaintiff's Sur-reply Memorandum, ECF No. 49.[1]  Having reviewed the filings, I find that a hearing is unnecessary.  *See* Loc. R. 105.6.  For the reasons stated herein, Defendant's Motion is GRANTED in part and DENIED in part. Accordingly, this Memorandum Opinion and Order disposes of ECF Nos. 41, 43, 45 and 49.

### I.  BACKGROUND

#### A.  Scope of Facts

In reviewing a motion for summary judgment, the Court considers the facts in the light most favorable to the non-movant, drawing all justifiable inferences in that party's favor.  *Ricci*

---

[1] On October 13, 2010, Judge Quarles referred this case to me for all proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c) and with the parties' consent.  ECF Nos. 8, 11 & 42.

*v. DeStefano*, 557 U.S. 557, 585–86 (U.S. 2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009); *Dean v. Martinez*, 336 F. Supp. 2d 477, 480 (D. Md. 2004).   Here, unless otherwise stated, undisputed facts comprise the background.   Where a dispute exists, I consider the facts in the light most favorable to Plaintiff.   *See Ricci*, 557 U.S. at 585–86; *George & Co.*, 575 F.3d at 391–92; *Dean*, 336 F. Supp. 2d at 480.   Nonetheless, I only consider facts that are supported by affidavits or other documents that would be admissible in evidence.   *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 535 (D. Md. 2007); *Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993); *see* Fed. R. Civ. P. 56(c)(1).   In its Reply at 6–10, Defendant questioned the admissibility of Plaintiff's Exhibit 19, ECF No. 43-19, a twelve-page, single-spaced typed document that Plaintiff authored ("Plaintiff's Journal" or "Journal"), which supports a number of Plaintiff's factual assertions, *see* Pl.'s Opp'n 7–13 & 16. In an October 17, 2012 Letter Order, I ruled that Plaintiff's Journal is inadmissible hearsay and permitted her to submit an affidavit that conformed with Fed. R. Civ. P. 56(c)(4) in lieu of the Journal.[2]   ECF No. 50.

Plaintiff filed the Second Declaration of Iris Foster ("Plaintiff's Declaration"), ECF No. 51-1, on October 23, 2012.   In a letter dated October 28, 2012, Defendant objected to Plaintiff's Declaration, arguing that Paragraphs 2–5, 7–10, 12, 13, 17, 18, 22, 24, and 25 are hearsay, and that Plaintiff lacked personal knowledge for Paragraph 22.   ECF No. 52.   Defendant also contended that Plaintiff's Declaration "attempts to incorporate Exhibit 19 (Plaintiff's Journal) by

---

[2] As Exhibits 18 and 20 to her Opposition, Plaintiff attaches May 10, 2007 and May 15, 2007 letters that she wrote to UMES's Director of Human Resources and Equity Officer Marie Billie, each of which includes a chronology of events. ECF Nos. 43-18 & 43-20.   Plaintiff uses these chronologies to support a number of factual assertions in her Opposition.   These chronologies replicate Plaintiff's Journal, almost verbatim in places.   The contents of Plaintiff's Journal are no more admissible as an attachment to a letter, and therefore these appended documents are inadmissible for the same reasons stated in my October 17, 2012 Letter Order.

reference," and Defendant objected on the ground that the Court "already indicated that it will not consider Plaintiff's Exhibit 19 at summary judgment."  Def.'s Oct. 28, 2012 Ltr. 2.

Defendant's objection to the bulk of Plaintiff's Declaration assumes that Plaintiff presents what she and others have said for the truth of their statements.  Yet, almost all of the statements that Plaintiff includes in her Declaration are not offered for their truth.  Rather, for most statements, "the mere making of the statement is the relevant fact."  Michael H. Graham, 30B *Fed. Prac. & Proc. (Fed. R. Evid.)* § 7005 (2011).  Most of these statements are examples of statements by Plaintiff's co-worker Rudolph Jones that Plaintiff found harassing.  For example, Plaintiff declares "Jones opined that my clothes fit me 'nice,'" Pl.'s Decl. ¶ 3, not to establish that her clothes fit her well, but rather to establish that Jones made an offensive comment about how Plaintiff's clothes fit her, regardless of the truth of his comment.   Similarly, Plaintiff states that "Jones responded: 'no, but I do have something on me that would stick you very hard,'" *id.* ¶ 8, not to establish the truth of Jones's statement, but rather to show that Jones made that crude statement.  *See also id.* ¶¶ 2–5, 7, 9, 10 & 22.

Other statements Plaintiff offers for the effect they have on her when they were made, not for their truth.  These are "statements made by one person which become known to another offered as a circumstance under which the latter acted and as bearing upon his conduct."  30B *Fed. Prac. & Proc. (Fed. R. Evid.)* § 7005.  Often, when Plaintiff states what Jones said, Jones's statements fall into this category because she offers them to show the circumstances under which she complained of harassment.  *See* Pl.'s Decl. ¶¶ 2–5, 8 & 9.  For example, Plaintiff states: "Jones told me that I looked nice in my suit and that him 'seeing me in the suit that I was wearing' gave him some ideas," *id.* ¶ 4, not for the statement's truth but to establish what motivated her to complain of harassment.  Plaintiff also states what she said to UMES's Director

of Human Resources and Equity Officer Marie Billie and Assistant Director of Public Safety Lawrence Edward Wright, Jr. to show the circumstances under which Billie and Wright addressed, or failed to address, Plaintiff's concerns. *See id.* ¶¶ 10, 13, 17, 18, 24 & 25. For example, Plaintiff states: "I told Wright in complete detail that Jones had kissed me, inappropriately touched me, said inappropriate things, and would not stop," to show that Wright knew that Plaintiff believed these events had happened at the time that he addressed, or failed to address, Plaintiff's complaint. *Id.* ¶ 10.

In other instances, Plaintiff offers statements that have "independent legal significance or give[] rise to legal consequences," such as "statements offered to place in context other statements otherwise admissible made in a conversation." 30B *Fed. Prac. & Proc. (Fed. R. Evid.)* § 7005. For example, Plaintiff states: "I told Jones that Brenda, Crystal and I got along great and they treated me well and that they wouldn't have any problems" to give context to Jones's response, which she quotes as, "'they better, they don't have a choice. But that's how we get you when you're least expecting it.'" Pl.'s Decl. ¶ 3; *see also id.* ¶¶ 7 & 8. Jones's response is otherwise admissible for its effect on Plaintiff as the listener, because it is an example of a statement that she felt was harassing. 30B *Fed. Prac. & Proc. (Fed. R. Evid.)* § 7005. Moreover, "the mere making of the statement is the relevant fact," and Plaintiff offers the statement as part of the harassment she experienced. *See id.*

Additionally, Plaintiff offers statements "for the purpose of showing the probable state of mind of the listener," such as "being placed on notice or having knowledge." 30B *Fed. Prac. & Proc. (Fed. R. Evid.)* § 7005. For example, Plaintiff states that, after Jones "stood behind [her] with his face close to the right side of [her face] and the front of his body against the back of [hers]," she told him "'I don't want any problems and I don't want to be a part of any

foolishness'" which put him on notice that she was not receptive to his behavior.  Pl.'s Decl. ¶ 3; *see also id.* ¶¶ 9, 10, 12, 13, 17, 18, 24 & 25.  Indeed, Plaintiff shows that her response to Jones was intended to notify him that she did not like his behavior and wanted him to stop when she characterizes one comment Jones made to her as made when Jones was "[e]ither not getting [her] message or simply not heeding it."  *Id.* ¶ 4.  Also, Plaintiff describes her complaints to Billie and Wright, *id.* ¶¶ 10, 13–18, 24–25, which notified them that Plaintiff felt she was being sexually harassed and retaliated against for her complaints.  All of these statements "fall[] outside the category of hearsay."  30B *Fed. Prac. & Proc. (Fed. R. Evid.)* § 7005.

A statement also is not hearsay if a party offers it against the opposing party and it "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  Fed. R. Evid. 801(d)(2)(D).  Plaintiff asserts: "Wright admitted that I was working at a higher level than the other police officers."  Pl.'s Decl. ¶ 12.  Wright was the Assistant Director of Public Safety, the department in which Plaintiff worked at UMES.  Compl. ¶¶ 7 & 12.  Therefore, he is an employee of UMES speaking within the scope of his employment relationship, and Plaintiff offers his statement against UMES.  Thus, it is not hearsay and therefore admissible.  Fed. R. Evid. 801(d)(2)(D).

The only statements that Defendant challenges in Plaintiff's Declaration that are hearsay appear in Paragraphs 12 and 24.  In Paragraph 12, Plaintiff states:

> Jones said I would make a good corporal, that I worked well with Chief Wright, that other officers had a lot to learn from me, and that I was the first person that he had seen come to the police department and work harder than Jones and security officer Strand.

Pl.'s Decl. ¶ 12.  Unlike Wright, Jones is not speaking within the scope of his employment because he is Plaintiff's co-worker and not her supervisor and therefore his job responsibilities did not extend to assessing Plaintiff's work performance on behalf of UMES.  Consequently, his

statement is outside the scope of Fed. R. Evid. 801(d)(2)(D).   Because Plaintiff offers his statement for its truth, to establish the quality of her job performance, *see* Pl.'s Opp'n 11, it is inadmissible.   In Paragraph 24, Plaintiff states that she told Billie that "Officers Sykes, Perry, Collins and Trader had all told [her] that others had been permitted [to work light duty]."   Pl.'s Decl. ¶ 24.   This statement is hearsay within hearsay, *see* Fed. R. Evid. 805, and none of the speakers—Plaintiff or the officers she quotes—spoke within the scope of their employment by UMES.   *See* Fed. R. Evid. 801(d)(2)(D).   Thus, this statement also is inadmissible for its truth, i.e, to demonstrate that other employees were allowed to work light duty.   *See* Pl.'s Opp'n 19. Because the statements in Paragraphs 12 and 24 are offered for their truth and no exception to the hearsay rule applies, they are inadmissible and I will not consider them as part of the facts of the case before me.   *Lorraine*, 241 F.R.D. at 535.

Additionally, Defendant objects that Plaintiff lacks personal knowledge regarding her assertions in Paragraph 22, in which she refers to the contents of a "bogus memo" that "Wright sent [her]."   Pl.'s Decl. ¶ 22.   Because Plaintiff received the memorandum, she has personal knowledge of it, and that is not a ground for excluding from evidence her comments about the memorandum.

Defendant also objects to Plaintiff's "attempts to incorporate Exhibit 19 (Plaintiff's Journal) by reference."   Def.'s Oct. 28, 2012 Ltr. 2. Indeed, Plaintiff states that "wherever [she] state[s] [in Exhibit 19] that [she] observed, heard or felt something . . . [she] incorporate[s] such statements within [her] declaration."   Pl.'s Decl. ¶ 28.   In my October 17, 2012 Letter Order, I already ruled that I would not consider Exhibit 19 on summary judgment, and I gave Plaintiff the opportunity "to submit an affidavit that conforms with Fed. R. Civ. P. 56(c)(4)."   Oct. 17, 2012

Ltr. Order 3.  Plaintiff has submitted her affidavit and, as stated in my Letter Order, that is all I will consider.

## B.  Factual History

On April 9, 2007, UMES hired Plaintiff to work as a University Police Officer II in the Department of Public Safety.  Compl. ¶ 1, ECF No. 1; Def.'s Mem. 1.  In the letter offering Foster the position, the Vice President for Administrative Affairs stated that, in accordance with UMES's policies, Foster would "be on a six-month probationary period."  Def.'s Mem. Ex. 1, ECF No. 41-2.

### 1.  Harassment by Jones

Before Plaintiff began to work at UMES, her co-worker Rudolph Jones "peep[ed] through a doorknob hole" at her while she was measured for her uniform.  Compl. ¶¶ 9–11; *see* Def.'s Mem. 4 n.2 (noting that Plaintiff complained for the first time about Jones peeping through the door at the Third Step Hearing of the Office of Administrative Hearings ("OAH")).  Then, during approximately Plaintiff's first month of employment, Jones "made comments about Foster's appearance and sexual desirability" and "persisted" after Foster "was clear with Jones that she was not interested."  Compl. ¶¶ 20–21; *see* Pl.'s Decl. ¶¶ 2–5 & 8.  Specifically, Jones told Plaintiff that she "looked nice," that her "clothes fit her 'nice,'" that "'seeing [her] in the suit that [she] was wearing' gave him some ideas," and that he had "'something on [him] that would stick [Plaintiff] very hard,'" and Jones said to others, in Plaintiff's presence, that he could "'just squeeze'" Plaintiff, "while wrapping his arms around himself and gyrating as if having sex."  Pl.'s Decl. ¶¶ 2–5 & 8.  Also, Jones "stood behind [Plaintiff] with his face close to the right side of [her] face and the front of his body against the back of [hers]" on one occasion, *id.* ¶ 3, and on another occasion, "approached [her] from behind while [they] were both standing, rubbing his

front side against [her] backside, reaching around [her] and holding [her] with his left hand such that his left arm touched [her] left breast while his left hand reached above [her] right breast," *id.* ¶ 6.  Jones also "surprisingly kissed Foster on her face." Compl. ¶ 32; *see* Pl.'s Decl. ¶5; Billie Aff. ¶ 8.  This made Plaintiff feel "embarrassed, surprised, ashamed and disappointed" and "as if [she] was going to throw up," and she immediately washed her face.  Pl.'s Decl. ¶ 5.

Plaintiff complained orally to Assistant Director of Public Safety Lawrence Edward Wright, Jr. on May 8, 2007.  *Id.* ¶ 10; May 11, 2007 Mem. from Wright to Plaintiff, Pl.'s Opp'n Ex. 24, ECF No. 43-24.  Thereafter, Plaintiff complained first orally and then in writing to UMES's Director of Human Resources and Equity Officer, Marie Billie, about Jones's behavior. Pl.'s Decl. ¶¶ 13–16; Def.'s Mem. 4; Foster's May 15, 2007 Ltr. to Billie ("May 2007 Ltr."), Def.'s Mem. Ex. 5, ECF No. 41-6; Billie Aff. ¶ 8.  Orally, Plaintiff only complained that Jones kissed her cheek.  Def.'s Mem. 4; Billie Aff. ¶ 8.  In writing, Plaintiff complained that Jones kissed and pinched her cheek, stood behind her, commented on her appearance, offered to measure her for her uniform, stood on the other side of the door (which had a hole in it) when she removed her shirt to be measured by a woman from the uniform company, and spoke with her about her job performance in a manner that Foster considered harassing.  May 2007 Ltr.

Billie investigated Foster's allegation that Jones kissed her, and "found that it had some merit" and that "the 'kiss on the cheek' [was] inappropriate."  Def.'s Mem. 5 (quoting Billie Aff. ¶ 9).  Specifically, Billie confronted Jones, who admitted that he "'pecked'" Plaintiff's cheek. Billie Aff. ¶ 8 (quoting Jones). According to Plaintiff, Billie "found evidence to support Foster's claims of sexual harassment" and informed Plaintiff that "Officer Jones did not deny the accusations."  Compl.  ¶¶ 47–48.  Plaintiff asserts that "Wright knew that the investigation was occurring" and "was apprised of the substance of the allegations."  *Id.* ¶ 50.  Additionally, before

Plaintiff began her employment, two former employees complained that Jones had sexually harassed them, but UMES did not formally discipline Jones. *Id.* ¶¶ 16–18; Billie Dep. 95:17–19, 113:2 – 115:4, Pl.'s Opp'n Ex. 10, ECF No. 43-10.   Billie stated that she investigated one employee's claims and "determined that her claims were not substantiated." Billie Aff. ¶ 11.

After Plaintiff complained in writing, Jones was reassigned to another location, Compl. ¶¶ 55–56; Def.'s Mem. 5, but not until after about thirty days had passed, Compl. ¶¶ 55–56; Pl.'s Decl. ¶ 23. Plaintiff claims that "[n]o formal disciplinary action was ever taken against Jones for harassing Foster," Compl. ¶¶ 57–58, but Billie states:

> Mr. Jones was disciplined by Dr. [Ronnie] Holden [Vice President of Administrative Affairs] and Mr. Jones was removed as supervisor of the security guards, transferred to another job in another location on campus, required to take sexual harassment training, and was required to sign a Last Chance Agreement with the University which essentially put him on notice that if there were any other issues with him, he would be terminated.

Billie Aff. ¶ 9.

### 2. Retaliation Concerns

In her Complaint, Plaintiff describes various events that she perceived as retaliatory. Compl. ¶¶ 51–54, 59–66 & 72–105.   For example, after Plaintiff reported the alleged harassment, "Wright virtually stopped talking with [Plaintiff], where previously Wright would share information with [her] about professional and personal subjects."   Pl.'s Decl. ¶ 21.   Also, Plaintiff claims that Wright refused to sign her tuition remission form, even though he had signed the form "for several other similarly situated employees."   Compl. ¶¶ 60–63.   Yet, Plaintiff provides no supporting evidence, and "Defendant denies that [Wright] ever refused to sign a tuition form." Def.'s Answers to Interrogs., Interrog. 19, Def.'s Mem. Ex. 14, ECF No. 41-15. Additionally Plaintiff's "work schedule was changed three times without advance notice to her," in a way that she perceived to be to her disadvantage.   Compl. ¶¶ 59 & 66; Def.'s Reply 18.

On August 27, 2007, Defendant extended Foster's probationary period for another six months, as recommended by the University System of Maryland "Policy on Probation for Nonexempt Employees." Aug. 27, 2007 Mem., Def.'s Mem. Ex. 2, ECF No. 41-3; Billie Aff. ¶ 6, Def.'s Mem. Ex. 6, ECF No. 41-7. The memorandum informing Foster of the extension stated that the extension was "no reflection upon [Foster's] job performance." Aug. 27, 2007 Mem. Billie stated in her affidavit that "since at least February, 2004 all non-supervisory police officers who had been hired at UMES and who had not previously been employed by UMES, had their probationary period extended for an additional six months beyond their initial six month probationary period" because UMES "could better evaluate police officers when they have experienced . . . one or two full semesters of all aspects of handling police duties at UMES." Billie Aff. ¶ 6.

Between June and September 2007, Plaintiff notified the Director of Human Resources (Billie), the Director of Public Safety (Wright) and his Administrative Assistant, and a Corporal with the Campus Police that she was concerned about retaliation. Compl. ¶ 72; *see* Pl.'s Decl. ¶ 15 (stating that Plaintiff notified Billie). Also, Plaintiff "alerted Billie of her intention to protect her rights through filing a claim with the Equal Employment Opportunity Commission." Compl. ¶ 90.

Plaintiff was injured on the job on September 6, 2007, and "medical professionals" limited her to light duty. *Id.* ¶¶ 76 & 80; *see* Def.'s Mem. 7; Billie Aff. ¶ 7. As a result of Plaintiff's injury, UMES took her off duty and informed her that "there was no light duty work available." Compl. ¶¶ 77 & 80; Def.'s Mem. 7. Defendant previously had allowed other employees to work light duty. Compl. §§ 81–82; Sykes Decl. ¶¶ 26–27, Pl.'s Opp'n Ex. 15, ECF No. 43-15. Billie stated, to the contrary, that "UMES has never allowed any police officer to

perform light duty while serving in the police officer's role."  Billie Aff. ¶ 7.  UMES did not allow Plaintiff to attend an in-service training, for which she previously had been approved, during the time she was off duty, notifying her only one day before the training.  Pl.'s Decl. ¶ 26; Compl. ¶¶ 86–89.  Billie explained that "[p]olice officers at UMES are not allowed to return to work until they are fully capable of performing all job functions."  Billie Aff. ¶ 7.

### 3.  Termination

On May 8, 2007, Wright told Plaintiff that she "was working at a higher level than the other police officers."  Pl.'s Decl. ¶ 12.  Her immediate supervisor, Sykes, declared that he "had no problems with her and not once had to write her up, she always came to work, and she fit right in with what [the department was] trying to do."  Sykes Decl. ¶ 61.  Moreover, Wright and Sykes "discussed promoting her to corporal before she made her sexual harassment complaint."  *Id.* ¶ 62.

Yet, Plaintiff's probation was extended for six months on August 27, 2007, Aug. 27, 2007 Mem., and on October 29, 2007, her employment was "rejected on probation," effective November 29, 2007.  Billie Aff. ¶ 5; *see* Compl. ¶ 101.  Billie stated that she and Holden "had some concerns about possible work performance issues," including that, as a "new employee, [Foster] had virtually no leave because she had used almost all of her accrued sick leave and personal leave," and that Foster displayed "inflexibility at times, including those related to schedule changes."  Billie Aff. ¶ 6.  Holden explained his decision, as "the final decision maker," to reject Plaintiff on probation as follows:

> I reviewed her file and I discussed with Chief Wright[] his recommendation . [*sic*]
> I recall that for the very short time Iris Foster was employed at UMES, that I was
> aware that she on multiple occasions refused to be flexible and stay when the
> UMES Police Department needed her to work before or beyond her scheduled
> work time off.  I also upon review of her record found that in my opinion she took
> an inordinate amount of sick leave and personal leave for a new employee

particularly when she [was] aware that the UMES Police Department was severally [*sic*] short staffed at the time of her hire.  It was my opinion and one of the basis [*sic*] of my decision to reject her on probation that Officer Foster did not make the effort I expect of all our police officers.  I was particularly concerned because in my experience virtually all new employees and particularly police officers make an effort when they first are on the job (and clearly the first year when they are on probation) to do a good job and be flexible as they are learning their job and accommodate requests of their employer.  It is absolutely critical and essential in any police department but particularly at UMES . . . for an employee to try and accommodate the needs of the University and the Police Department.

Holden Aff. ¶ 6, Def.'s Reply Ex. 8, ECF No. 45-8.

Indeed, at least once, Foster refused to change her schedule to cover a shift that was vacant due to understaffing.  Def.'s Mem. 6; Mar. 25, 2008 OAH Decision, Def.'s Mem. Ex. 4, ECF No. 41-5.  Other concerns included Foster's inaccessibility "by phone on [one] occasion," and "an incident where she changed state mandated forms without permission by the Chief," and "another incident where she had created a possible dangerous situation by moving furniture."  Billie Aff. ¶ 6.  Plaintiff claims that she "obtained authority from Wright and Sykes" to "make improvements to the appearance of certain departmental forms," Compl. ¶¶ 27–29, and characterizes the memorandum Wright sent her stating that she "changed departmental forms without his consent" as "bogus," Pl.'s Decl. ¶ 22.  Sykes, whose declaration Plaintiff cites in support of her assertion, does not state that he or Wright authorized Plaintiff to change the forms; he simply states that "Chief Wright wanted the forms revised and praised the results."  Sykes Decl. ¶ 50.  Plaintiff also alleges that Wright "gave permission" for her to "move a large table out of the squad . . . room into the holding area."  Compl. ¶ 22.  According to Sykes, "Chief Wright never showed any displeasure with the furniture rearrangement . . . ."  Sykes Decl. ¶ 51.  Billie and Holden also questioned Foster's "judgment on certain matters, and whether she was committed to the needs of the UMES police department."  Billie Aff. ¶ 6.

Foster appealed the termination decision, and "by written decision the hearing officer upheld UMES's rejection of Officer Foster while on probation." *Id.* ¶ 5.  Foster appealed that decision also.  *Id.*

Meanwhile, Plaintiff "was replaced by David Briscoe, a male."  Pl.'s Opp'n 21 n.15; UMES Mar. 19, 2008 Ltr. to Briscoe, Pl.'s Opp'n Ex. 29, ECF No. 43-28.  Plaintiff claims that, as of August 31, 2012, when she filed her Opposition, "[i]n all, 16 officers were hired after Foster was fired, including 14 males," Pl.'s Opp'n 21 n.15, but she does not provide any evidence to support this claim.  Holden stated in his Affidavit that, as of September 21, 2012, "seven female police officers have been hired at UMES since Officer Foster was rejected on probation."  Holden Aff. ¶ 15.

### C.  Procedural History

Foster filed a complaint with the Equal Employment Opportunity Commission ("EEOC") in November 2007, which issued a Notice of Suit Rights, after which Foster brought suit in this Court.  Compl. ¶¶ 5–6.  Her two-count complaint is for "Hostile Environment and Termination Based on Gender in Violation of Title VII . . . of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq." and "Retaliatory Harassment and Termination for Activities Protected by Title VII."  Compl. 11 & ¶¶ 106–17.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Meson v. GATX Tech. Servs. Corp.*, 507 F.3d 803, 806 (4th Cir. 2007).  The moving party bears the

burden of demonstrating that no genuine dispute exists with regards to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987).

If the party seeking summary judgment demonstrates that there is no admissible evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial. *Lorraine*, 241 F.R.D. at 535. The existence of only a "scintilla of evidence" is insufficient to defeat a motion for summary judgment. *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Instead, the evidentiary materials submitted must show facts from which the finder of fact could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 251. To satisfy this burden, the nonmoving party "must produce competent evidence on each element of his or her claim." *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999).

A "genuine" dispute of material fact is one where the conflicting evidence creates "fair doubt"; wholly speculative assertions do not create "fair doubt." *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001); *see also Miskin*, 107 F. Supp. 2d at 671. The substantive law governing the case determines what is material. *See Hoovan-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A fact that is not of consequence to the case, or is not relevant, in light of the governing law, is not material. *Id.*; *see* Fed. R. Evid. 401 (defining relevance).

## III.   DISCUSSION

### A.  Plaintiff's Hostile Work Environment Claim

Plaintiff's first count is for "Hostile Environment and Termination Based on Gender in Violation of Title VII." Compl. 11 & ¶¶ 106–11. This count seems to encompass claims for hostile work environment based on sex and sex-based termination, which are separate causes of action. *Compare Westmoreland v. Prince George's County, Md.*, --- F. Supp. 2d ---, 2012 WL

2446154, at *17 (D. Md. June 26, 2012) (stating elements of "hostile work environment claim

based on sex"), *with Riley v. Technical & Mgmt. Servs. Corp.*, 872 F. Supp. 1454, 1460–61 (D.

Md. 1995) (stating elements of "discharge on the basis of gender"), *aff'd*, 79 F.3d 1141 (4th Cir.

1996).   Therefore, I construe Plaintiff's first count to include these two claims.   *See* Fed. R. Civ.

P. 1; *see also Monge v. Portofino Ristorante*, 751 F. Supp. 2d 789, 792 n.1 (D. Md. 2010)

(explaining that Rule 1 instructs the Court "not [to] exalt form over substance"); *Hall v. Sullivan*,

229 F.R.D. 501, 504 (D. Md. 2005) (same).

Under Title VII, it is "an unlawful employment practice for an employer . . . to

discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).

To be actionable under 42 U.S.C. § 2000e-2(a)(1), discrimination need not be "economic" or

"tangible." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (citations and quotation

marks omitted).   Rather, "[w]hen the workplace is permeated with 'discriminatory intimidation,

ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment,' Title VII is violated." *Id.* (quoting

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986) (internal brackets and quotation

marks omitted)).

A claim for hostile work environment based on sex is actionable under Title VII if the

plaintiff shows that "'the offending conduct (1) was unwelcome, (2) was because of her sex, (3)

was sufficiently severe or pervasive to alter the conditions of her employment and create an

abusive working environment, and (4) was imputable to her employer.'"   *Westmoreland*, 2012

WL 2446154, at *17 (quoting *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 331 (4th Cir. 2011)

(internal citation and quotation marks omitted)).   "In a case where an employee is sexually

15

harassed by a co-worker, the employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it." *Hoyle*, 650 F.3d at 335 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998)).

Defendant challenges only the third and fourth elements of Plaintiff's claim in its Motion. *See* Def.'s Mot. 11–14. "To establish the third element of a sex-based hostile environment claim, a plaintiff must show that the work environment was 'permeated with "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of [their] employment and create an abusive working environment."' *Engler v. Harris Corp.*, No. GLR-11-3597, 2012 WL 3745710, at *5 (D. Md. Aug. 28, 2012) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citation omitted)). Additionally, "[t]he plaintiff must show that she subjectively felt that the work environment was hostile or abusive and that the work environment was objectively hostile or abusive to a reasonable person." *Id.* (citing *Harris*, 510 U.S. at 22). The Court determines whether the work environment was sufficiently hostile by considering "the totality of the circumstances, which include: (1) the 'frequency of the discriminatory conduct'; (2) 'its severity'; (3) 'whether it is physically threatening or humiliating, or a mere offensive utterance'; and (4) 'whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23); *see Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011) (same).

This Court recently discussed the "'high bar'" set in *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008), which a plaintiff must clear to establish that the offensive conduct was sufficiently severe and pervasive:

> Intermittent acts of harassment are insufficient to establish that a hostile work environment is severe or pervasive. Indeed, Title VII does not mandate civility in the workplace. Further, a supervisor's strict management style or degree of supervision is not evidence of actionable harassment. However, a work

environment can be considered hostile if it is "consumed by remarks that intimidate, ridicule, and maliciously demean the status of women."

*Engler*, 2012 WL 3745710, at *5 (internal citations omitted).   Notably, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"   *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations omitted); *Romeo v. APS Healthcare Bethesda, Inc.*, No. WDQ-11-2208, 2012 WL 1852264, at *9 (D. Md. May 17, 2012) (quoting *Faragher*).

Defendant argues that "Officer Foster's allegations of a hostile work environment fall woefully short of that which is required to state a legally cognizable claim of harassment." Def.'s Mem. 11.   In Defendant's view, the alleged incidents of harassment "were isolated incidents" that "were relatively minor" and not "physically threatening." *Id.* at 12.   Defendant insists that the alleged incidents did not have "a discernible impact on Officer Foster's work performance." *Id.*

Plaintiffs notes that, in a June 5, 2007 letter that Plaintiff attached as Exhibit 21 to her Opposition, "Defendant's in-house counsel [Billie] . . . admitted, and the Vice President ratified, that 'Jones engaged in inappropriate sexual harassment due to the severity, pervasiveness and persistence of his behavior toward Officer Foster." Pl.'s Opp'n 24 (quoting June 5, 2007 Ltr. From Billie to Holden, Pl.'s Opp'n Ex. 21, ECF No. 43-21).   On that basis, Plaintiff insists that the severity of the offensive conduct is established. *Id.* at 24.   She contends that the harassment included "inappropriate physical touching, taunts and sexual come-ons," and that Wright's "May 11 memo . . . falsely denying Foster's meeting with him and Jones, setting Foster up for failure and falsely accusing her of job deficiencies, and refusing to communicate with her" contributed to the hostile work environment. *Id.* at 25.   Plaintiff argues that the harassment was sufficiently severe under a subjective inquiry because "Foster found the treatment intolerable, as evidenced

by her crying" and "her need . . . to cleanse herself after Jones touched her . . . ." *Id.* She also argues that the harassment was sufficiently severe under an objective inquiry, for which she contends that "[p]ersonalized demeaning and humiliating comments made in front of others may suffice," because Jones made comments to her, kissed her, rubbed his body against hers, held her, and made comments in front of their co-workers. *Id.* at 25–26. According to Foster, "Wright compounded the objective severity of the situation by refusing to complete a conversation with Foster about Jones' harassment without . . . inviting Jones in" and later "denying Jones' harassment, before setting Foster up for failure and falsely accusing her of job deficiencies, refusing to communicate with her, denying her light duty . . . , revoking her training permission . . . , and finally firing her." *Id.* at 26.

Defendant replies that violation of the UMES policy against sexual harassment is not necessarily "actionable sexual harassment under Title VII" because the UMES policy "prohibits severe or pervasive sexual misconduct that has the purpose or effect of creating a 'hostile or offensive work environment,'" which, in Defendant's view, is a "broader [definition] than the EEOC definition." Def.'s Reply 11. Thus, Defendant maintains, "Officer Foster has fallen short of alleging sexual harassment as a matter of law, even though Mr. Jones's misconduct violated UMES policy and warranted discipline." Def.'s Reply 11.

*Hoyle v. Freightliner, LLC*, 650 F.3d 321 (4th Cir. 2011), provides guidance. There, Hoyle's coworkers "repeated[ly] display[ed] . . . sexualized photos of women," *id.* at 332, "yelled" at Hoyle for complaining about the photos to her supervisor, commented about not being able to "see up under [her] pants," and attached a tampon to a key ring, *id.* at 326. Noting that "[t]he question of whether harassment was sufficiently severe or pervasive is

'quintessentially a question of fact,'" the Fourth Circuit reversed the district court's grant of

summary judgment for the employer.  *Id.* at 333.   It reasoned, *id.* (internal citation omitted):

> The district court failed to recognize that a reasonable juror could
> reasonably find that, taken together, the various incidents and displays 'that
> consistently painted women in a sexually subservient and demeaning light were
> sufficiently severe or pervasive to alter the conditions of [the plaintiff's]
> employment and to create an abusive work environment.
>
> . . . [T]he evidence might well persuade a reasonable juror that in the aggregate,
> the incidents and displays would have been objectively abusive to a reasonable
> person in Hoyle's position. Furthermore, the district court's consideration that the
> conduct of Hoyle's co-workers was "not physically threatening," while certainly
> an appropriate factor in assessing a plaintiff's evidence, is not controlling.
> Actionable harassment can be severe and/or pervasive without being physically
> threatening, e.g., where it is humiliating and demeaning. In sum, the evidence
> marshaled by Hoyle was sufficient to generate a genuine dispute of material fact
> as to whether the abusive aspects of her work environment were severe or
> pervasive.

Here, Jones repeatedly "made comments about Foster's appearance and sexual

desirability" and "persisted" after Foster "was clear with Jones that she was not interested,"

kissed her, rubbed his body against hers, held her, and watched her.  Pl.'s Decl. ¶¶ 2–6 & 8.

Although Plaintiff has not provided specific dates or the exact number of times Jones allegedly

made offensive comments, she has indicated that he made comments on "numerous . . .

occasions," and all of the allegedly offensive comments and actions occurred during

approximately Plaintiff's first month of employment.   By "peeping" at, kissing, touching,

holding, and making comments to Plaintiff on "numerous . . . occasions" over the course of only

about thirty days, Jones engaged in offensive conduct frequently.   Moreover, kissing, touching

and holding certainly are physical acts.   Neither the individual incidents nor their duration is

overwhelming, yet a reasonable jury could conclude that the offensive conduct was pervasive.

*See Barnes v. Metro. Mgmt. Grp., L.L.C.*, No. 11-CV-3355 AW, 2012 WL 1552799, at *3 (D.

Md. Apr. 27, 2012) (concluding that comments about plaintiff's "'butt,' 'breasts,' and 'chest'"

and  that plaintiff "was 'sexy,'" repeated over six-month period, were sufficient to establish harassment that was severe or pervasive); *Hoyle*, 650 F.3d at 333.  Thus, a reasonable jury could conclude that the conduct was objectively hostile or abusive.  *See Harris*, 510 U.S. at 22. Additionally, after Jones kissed her, Plaintiff felt "embarrassed, surprised, ashamed and disappointed" and "as if [she] was going to throw up," and she immediately washed her face. Pl.'s Decl. ¶ 5.  Based on Plaintiff's response, a reasonable jury also could conclude that Jones's conduct was subjectively hostile or abusive to Plaintiff.  *See Harris*, 510 U.S. at 22.

With regard to the fourth element, that the conduct "was imputable to her employer," *Westmoreland*, 2012 WL 2446154, at *17 (citations and quotation marks omitted), the parties agree that "[a]n employer is liable for harassment by the victim's coworkers 'if it knew or should have known about the harassment and failed to take effective action to stop it.'"  Pl.'s Opp'n 26 (quoting *Howard v. Winter*, 446 F.3d 559, 565 (4th Cir. 2006) (internal quotation marks and citation omitted)); *see* Def.'s Mem. 9 ("An employer is vicariously liable for maintaining a hostile work environment only 'if it knew or should have known about the conduct *and* failed to stop it.'" (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 759 (1998)) (emphasis added in Def.'s Mem.)).

Defendant contends that the alleged harassment cannot be imputed to UMES because "UMES promptly responded to Officer Foster's concerns by eliminating the purported hostility from the work environment and disciplining the offending employee," Def.'s Mem. 13–14. Defendant insists that UMES "immediately advised Mr. Jones to have no contact with the Plaintiff," and, within a month, disciplined Officer Jones by "removing him as the supervisor of security[;] removing him from any security guard responsibilities at all," Def.'s Reply 12; "transferr[ing] Officer Jones to another area of campus"; requiring Officer Jones to "attend

counseling/sexual harassment training" and "requir[ing] Officer Jones to sign a 'Last Chance' agreement with UMES," Def.'s Mem. 10–11.  Noting that "Officer Foster's Opposition Brief does not allege any more instances of inappropriate behavior of a sexually harassing nature after May 8, 2007," Defendant insists that "[i]t is not disputed that Mr. Jones's misconduct ceased after UMES reprimanded him."  Def.'s Reply 12.

Indeed, Plaintiff does not contend that Jones's behavior continued after she complained on May 8, 2007.  Rather, Plaintiff insists that Wright and Billie's actions "continue[d] the hostile work environment in another form," as discussed *supra*, such that the reassignment of Jones and UMES's other actions with regard to Jones did not end the hostile work environment.  Pl.'s Opp'n 28–29.  She charges that, when an employee complains of sexual harassment, an "employer must do something 'meaningful'" that "a 'rational juror'" would perceive "as 'reasonably calculated to end the harassment,'" and "[a]n employer whose sole action is to conclude that no harassment occurred cannot in any meaningful sense be said to have 'remedied' what happened."  *Id.* at 27 (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 320 (4th Cir. 2008)).  This understates the undisputed facts and ignores the significance of the evidence that UMES transferred Jones to a position away from Plaintiff and required him to attend counseling and sign a "'Last Chance' agreement."  Def.'s Mem. 10–14.  These were actions that UMES took that were "reasonably calculated to end the harassment."  *Sunbelt Rentals*, 521 F.3d at 320.

Moreover, Plaintiff's argument that the hostile work environment continued through Wright and Billie's actions necessarily fails because Plaintiff has not claimed, let alone demonstrated, that either Wright or Billie's actions were based on Plaintiff's sex, such that their actions could not be actionable sexual harassment.  *See Davis v. Dimensions Health Corp.*, 639 F. Supp. 2d 610, 614 (D. Md. 2009) ("'An employee is harassed or otherwise discriminated

against "because of" his or her gender if, "but for" the employee's gender, he or she would not have been the victim of the discrimination.' *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000). A plaintiff must show that he is 'the individual target of open hostility because of [his] sex.' *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (citing *Smith*, 202 F.3d 242–43).") ; *see also Westmoreland*, 2012 WL 2446154, at *17. All Plaintiff claims is that "authorities are clear that actions such as those taken by Defendant in responding to Foster's sex harassment complaint may be treated as part of the hostile environment," Pl.'s Opp'n 28; yet she does not identify any of those authorities.

Alternatively, Plaintiff argues that "Defendant is liable . . . because Defendant failed to protect Foster from sexual harassment that was foreseeable based upon Jones' prior commission of similar acts against another woman ['Employee C'] in the workplace," Pl.'s Opp'n 29, and "[f]ailure to prevent such repeat was negligence," *id.* at 32. Plaintiff relies on *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir. 2001), in which the Second Circuit stated that, "[i]f an employer is on notice of a likelihood that a particular employee's proclivities place other employees at unreasonable risk of rape," an employer has a "responsibility to warn or protect likely future victims." In *Ferris*, the employer "had been notified that [a male employee] had twice raped female co-workers and had engaged in other abusive, sexually hostile conduct toward the rape victims and a third co-worker," but did "nothing about it" and went as far as taking "affirmative steps to prevent the filing of a formal complaint that might have resulted in protective steps and even to prevent a prior victim . . . from informally spreading cautionary words among the flight attendants about [the male employee]." *Id.*

Defendant replies that the "allegations pertaining to Employee C do not impute liability to UMES," Def.'s Reply 6, because the Fourth Circuit has not adopted the Second Circuit failure

to warn theory of liability, *id.* at 7. Further, Defendant argues, "[e]ven if the Court were inclined to adopt the Second Circuit's . . . negligence theory, Mr. Jones's alleged prior misconduct [with Employee C] still would not have obligated UMES to warn Officer Foster about Mr. Jones's alleged prior misconduct, particularly because the EEOC and UMES['s] own investigation had found that the behavior had not occurred," *id.* at 8.

Neither the Fourth Circuit nor this Court has cited *Ferris* for this proposition, and *Ferris* is not binding on this Court. Plaintiff has not cited any binding authority for her argument that UMES was duty-bound to protect her from Jones. Moreover, even if UMES could be liable in negligence for failing to warn an employee that her co-worker previously had sexually harassed another co-worker, the duty would not apply in this case. This is because Plaintiff has not established that Jones harassed Employee C and therefore cannot establish that UMES was "on notice" that Jones's "proclivities place[d] other employees at unreasonable risk." *See Ferris*, 277 F.3d at 136. Rather, Plaintiff offers Employee C's deposition testimony, in which Employee C claims that Jones sexually harassed her, Employee C Dep. 8:7 – 10:2, Pl.'s Opp'n Ex. 6, ECF No. 43-6; the complaint Employee C filed with the Maryland Commission on Human Relations ("MCHR"), in which she claimed that Jones sexually harassed her, Pl.'s Opp'n Ex. 7, ECF No. 43-7; Employee C's letter to Chief Bell, in which she claims that she was terminated because she "defended [her]self to sexual harassment," Pl.'s Opp'n Ex. 8, ECF No. 43-8; MCHR's letter to UMES, informing UMES that Employee C filed a complaint with it, Pl.'s Opp'n Ex. 9, ECF No. 43-9; Billie's deposition testimony, in which Billie noted that there had been other complaints against Jones prior to Plaintiff's complaint, including Employee C's complaint, Billie Dep. 95:17–19, 113:2 – 115:4; and Holden's deposition testimony, in which he stated that he could not recall if Employee C made a complaint to UMES, but remembered that Employee C filed a

complaint with MCHR and MCHR determined "that there was no probable cause," Holden Dep. 49:2–11, Pl.'s Opp'n Ex. 13, ECF No. 43-13.      This evidence shows that Employee C complained that Jones sexually harassed her, but it also establishes that MCHR found her complaint to be without merit.  Holden Dep. 49:2–11.  These are very different circumstances from *Ferris*, where the employer discouraged the filing of a formal complaint and, consequently, there was no suggestion that the allegations were unfounded. Therefore, Defendant had no duty to warn Plaintiff of the alleged but unproven harassment.  *See Ferris*, 277 F.3d at 136.

Consequently, because Plaintiff has not shown that Defendant "failed to stop" the alleged sexual harassment or had a duty to warn Plaintiff before the harassment began, Plaintiff has not established that the harassment can be imputed to Defendant.   Thus, the evidence supporting Plaintiff's claim does not establish the fourth element of this cause of action.  *See Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999).  Put another way, Plaintiff has not offered evidence to create a "genuine issue as to any material fact," and Defendant is entitled to judgment as a matter of law on Plaintiff's claim for hostile work environment based on sex.  Fed. R. Civ. P. 56(c); *see Meson v. GATX Tech. Servs. Corp.*, 507 F.3d 803, 806 (4th Cir. 2007).

### B.  Plaintiff's Gender-Based Termination Claim

To succeed on a claim for gender-based termination, a plaintiff must show

(1) that she is a member of a protected class; (2) that she was performing the job satisfactorily; (3) that she was discharged or constructively discharged; and (4) that she was replaced by someone with comparable qualifications outside the protected class or that the position remained open to similarly qualified applicants after her discharge.

*Riley v. Technical & Mgmt. Servs. Corp.*, 872 F. Supp. 1454, 1460–61 (D. Md. 1995); *see Westmoreland v. Prince George's County, Md.*, --- F. Supp. 2d ---, 2012 WL 2446154, at *7 (D. Md. June 26, 2012).   In the Fourth Circuit, the burden-shifting framework established in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–06 (1973), applies to Title VII claims, including termination and retaliation claims.  *IJames v. Autumn Corp.*, No. 1:08CV777, 2009 WL 2171252, at *8 (M.D.N.C. July 20, 2009); *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 546 (4th Cir. 2006).   Under this framework, after an employee makes out a *prima facie* case, the burden shifts to the employer, which then must "proffer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Wright v. Sw. Airlines*, 319 Fed. App'x 232, 233 (4th Cir. 2009). If the employer does so, the burden shifts back to the employee "to prove by a preponderance of the evidence that the proffered reasons were pretextual." *Id.* at 233.

Plaintiff has failed to make out a *prima facie* case for gender-based discrimination.  It is undisputed that she is female and therefore "a member of a protected class"; that UMES terminated her employment, Compl. ¶ 101; Def.'s Mem. 2; and that she was replaced by a male, Pl.'s Opp'n 21 n.15; UMES Mar. 19, 2008 Ltr. to Briscoe.  *See Riley*, 872 F. Supp. at 1460–61.  Also, taken in the light most favorable to Plaintiff, there arguably is evidence that Plaintiff "was performing the job satisfactorily."[3] Sykes Decl. ¶¶ 61–62; *see Riley*, 872 F. Supp. at 1460.  Yet,

---

[3] With regard to this element, *Parish v. Siemens Medical Solutions USA, Inc.*, 429 Fed. App'x 216, 218 (4th Cir. 2011), is informative.  There, Parish sued his employer for, *inter alia*, racial discrimination, and the district court granted summary judgment for the employer on the ground that "Parish was not performing his job at a satisfactory level and thus could not sustain a discrimination claim."  *Id.* at 216–17.  Affirming the district court, the Fourth Circuit observed that "[t]he record [was] replete with examples of management dissatisfaction with Parish's performance."  *Id.* at 218.  The Fourth Circuit concluded that the evidence showed that Parish's job performance was dissatisfactory, despite the fact that Parish "offer[ed] statements from one of his subordinates and a fellow supervisor in support of his claim," because "'[i]t is the perception of *the decisionmaker* which is relevant.'"  *Id.* (emphasis added) (quoting *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217 (4th Cir. 2007)).  Here, although Plaintiff's direct supervisor, Sykes, had positive comments regarding Plaintiff's work performance, the final decision maker was Holden, who said that Plaintiff "did not make the effort [he] expect[ed] of all [UMES] police officers," based on the fact that "she on multiple occasions refused to be flexible and stay when the UMES Police Department needed her to work before or beyond her scheduled

to make out a *prima facie* case, Plaintiff must show, not only that she was replaced by a male, but also that the person who replaced her had "comparable qualifications." *Riley*, 872 F. Supp. at 1460–61. It appears that Briscoe, the male who replaced Plaintiff, was better-qualified than Plaintiff because Plaintiff was hired as a Police Officer II with an annual salary of $39,500, and Brisco was hired as a Police Officer III with an annual salary of $48,000. *Compare* UMES Mar. 12, 2007 Ltr. to Foster *and* Compl. ¶ 7 *with* UMES Mar. 19, 2008 Ltr. to Briscoe. "When the replacement employee has greater qualifications, an inference that the discharge was motivated by discrimination is simply not warranted." *Blisten v. St. John's College*, 74 F.3d 1459, 1467 n.7 (4th Cir. 1996) (emphasis removed), *overruled on other grounds as stated in Adams v. Moore Business Forms, Inc.*, 224 F.3d 324, 327 (4th Cir. 2000); *see Devan v. Barton-Cotton, Inc.*, 141 F.3d 1158 (Table), 1998 WL 183844, at *4 (4th Cir. 1998) (concluding that, where plaintiff was a "high school graduate, without a college degree" and his replacement had an undergraduate degree, a master's degree, and "significant experience" as "a former partner at . . . the largest consulting firm in the world," the plaintiff "failed to present sufficient evidence to create a jury question as to whether he was comparably qualified" to his replacement, and because plaintiff could not "show that he ha[d] comparable qualifications" to his replacement, plaintiff "failed to present sufficient evidence to establish a prima facie case of age discrimination"). Plaintiff has neither generated a jury question regarding the comparability of her and Briscoe's qualifications,

---

work time off," and "took an inordinate amount of sick leave and personal leave for a new employee particularly when she [was] aware that the UMES Police Department was severally [*sic*] short staffed at the time of her hire." Holden Aff. ¶ 6. According to Holden, it was "absolutely critical and essential in any police department but particularly at UMES . . . for an employee to try and accommodate the needs of the University and the Police Department." *Id.* Thus, the evidence Plaintiff presents may not be sufficient to support this element of her claim for gender-based discrimination. For purposes of this determination, however, I will assume, *arguendo*, that she was performing satisfactorily.

nor established a *prima facie* case of gender-based termination, *see Riley*, 872 F. Supp. at 1460–61, and summary judgment is appropriate on this claim.  *See* Fed. R. Civ. P. 56(c).

### C.  Plaintiff's Retaliation Claim

Plaintiff's second count is for "Retaliatory Harassment and Termination for Activities Protected by Title VII."  Compl. 11 & ¶¶ 112–17.  42 U.S.C. § 2000e-3(a) provides that it is unlawful for an employer "to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  Although "[t]he plain meaning of the statutory language provides protection of an employee's opposition activity when the employee responds to an actual unlawful employment practice," the Fourth Circuit has "[r]ead[] the language generously to give effect to its purpose" and "held that opposition activity is protected when it responds to an employment practice that the employee *reasonably believes* is unlawful."  *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006).

To succeed on a Title VII retaliation claim, a plaintiff must show that (1) she "'engaged in protected activity,'" (2) the employer "'took adverse action against [her],'" and (3) "'a causal relationship existed between the protected activity and the adverse employment activity.'"  *Westmoreland v. Prince George's County, Md.*, --- F. Supp. 2d ---, 2012 WL 2446154, at *15 (D. Md. June 26, 2012) (quoting *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004)).  Once again, the *McDonnell Douglas* burden-shifting framework applies.  *See IJames v. Autumn Corp.*, No. 1:08CV777, 2009 WL 2171252, at *8 (M.D.N.C. July 20, 2009); *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 546 (4th Cir. 2006).

### 1.   *Prima Facie Case*

With regard to the first element, Plaintiff complained that Jones sexually harassed her. Pl.'s Decl. ¶¶ 10, 13–16; Billie Aff. ¶ 8.   Defendant argues that "Officer Foster's opposition activity is not protected" because "it is not objectively reasonable to conclude that [Jones's] conduct complained of was sufficiently severe or pervasive to alter the conditions of Officer Foster's employment." Def.'s Mem. 15.   Yet, as discussed *supra*, a reasonable jury could conclude that Jones's conduct was objectively hostile or abusive.   Consequently, Plaintiff reasonably believed that Jones's behavior was unlawful, and the actions she took to complain about how Jones treated her are protected. *Jordan*, 458 F.3d at 338.   Plaintiff has established the first element of her Title VII retaliation claim. *See Westmoreland*, 2012 WL 2446154, at *15.

As to the second element, Defendant does not contend that its decision to terminate Plaintiff's employment was not an adverse employment action.   Instead, Defendant insists that "none of [the four other incidents that Plaintiff views as retaliatory] qualify as 'adverse employment actions,'" Def.'s Mem. 17, and, focusing on those incidents, asserts in its Reply that Plaintiff "has not identified an adverse employment action," Def.'s Reply 17.   However, in her Opposition, Plaintiff does not allege that anything but her termination constituted an adverse employment action, and she notes that "[t]here is no dispute that the termination constituted an adverse action." Pl.'s Opp'n 35.   Indeed, "termination constitutes an adverse employment action within the meaning of Title VII." *Gage v. Cort Business Servs.*, 410 Fed. App'x 725, 726 (4th Cir. 2011).   Thus, Plaintiff has established the second element of her Title VII retaliation claim. *See Westmoreland*, 2012 WL 2446154, at *15.

With regard to the third element, Defendant contends that Plaintiff fails to show the required causal connection between her purportedly protected activity (complaining about

Jones's behavior) and her termination because "almost six months separate the protected activity of reporting the sexual harassment and Officer Foster's rejection on probation," which is not sufficient temporal proximity. Def.'s Mem. 15–16.   Plaintiff counters that her termination occurred soon enough after she complained of sexual harassment because, as she sees it, she complained of sexual harassment in May; Defendant retaliated through actions between April and September, including by denying her a light duty assignment when she was injured; and "[t]he firing came approximately 3 weeks after Foster's meritorious protest regarding the retaliatory denial of light duty, and in the context of the ongoing protected activity." Pl.'s Opp'n 36–37.   Alternatively, Plaintiff insists that "[t]he requirement is for causality, not temporality; temporality is merely one way of proving causality." *Id.* at 35.   In Plaintiff's view, causality is established because "Billie admitted to the connection between Foster's complaints and the termination" by "testify[ing] that she felt Foster was wrongly 'fixated' on and 'preoccupied' with retaliation and would henceforth blame all workplace troubles on it" and by "participat[ing] in the firing, supporting it 'because' she did not feel there was retaliation." *Id.*

Plaintiff complained about Jones's behavior on May 8, 9, and 10, 2007. Pl.'s Decl. ¶¶ 10, 13 & 15. UMES informed Plaintiff on October 29, 2007 that her employment would end on November 29, 2007.  Billie Aff. ¶ 5.  Thus, more than five months passed between Plaintiff's protected action and the termination of her employment, too long a period for Plaintiff to establish a causal relationship on temporal proximity alone.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'") (citation omitted); *Alexander v. Glut Food Coop*, No. 10-cv-955-AW,

29

2012 WL 4846759, at *4 (D. Md. Oct. 10, 2012) ("Absent additional evidence probative of causation, temporal proximity of three-and-a-half months is insufficient to support the inference that the protected activity caused the adverse act."); *Westmoreland*, 2012 WL 2446154, at *10 ("Although there is no bright-line rule on the issue of temporal proximity, the Fourth Circuit has held that a lapse of over three months between the protected activity and the alleged retaliation is too long to give rise to an inference of causality."). Additionally, if the decision to extend Plaintiff's probation, made August 27, 2007, were seen as the adverse employment action, it also was too far after Plaintiff's complaint of sexual harassment—trailing it by three and a half months—to establish a causal relationship on temporal proximity alone. *See Alexander*, 2012 WL 4846759, at *4; *Westmoreland*, 2012 WL 2446154, at *10.

Nonetheless, a plaintiff may show a causal connection by other means: "[A]s this Court has consistently held, 'plaintiffs may state a prima facie case of causation by relying on evidence other than, or in addition to, temporal proximity where such evidence is probative of causation.'" *Alexander*, 2012 WL 4846759, at *3 (quoting *Jenkins v. Gaylord Entm't Co.*, 840 F. Supp. 2d 873, 881 (D. Md. 2012)); *see Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (noting that "other relevant evidence may be used to establish causation" where temporal proximity is missing). Thus, "'courts may look to the intervening period for other evidence of retaliatory animus' which 'may be used to establish causation.'" *Westmoreland*, 2012 WL 2446154, at *10 (quoting *Lettieri*, 478 F.3d at 650).

Defendant does not dispute that, after Plaintiff was injured on the job and restricted to light duty in September 2007, Compl. ¶¶ 76 & 80; Def.'s Mem. 7; Billie Aff. ¶ 7, and which was between when Plaintiff complained of harassment and when Defendant notified Plaintiff that she was terminated, UMES took Plaintiff off duty and informed her that "there was no light duty

work available."  Compl. ¶¶ 77 & 80; Def.'s Mem. 7.  Defendant offers evidence that "UMES has never allowed any police officer to perform light duty while serving in the police officer's role."  Billie Aff. ¶ 7.  According to Defendant, "there is no light duty for police officers – they may only return to duty when they are 100% fit, for safety reasons."  Mar. 25, 2008 OAH Decision 13; *see* Def.'s Answers to Interrogs., Interrog. 13 (same).  Yet, Plaintiff offers evidence to the contrary, that Defendant previously had allowed other officers to work light duty.  Sykes Decl. ¶¶ 26–27.  According to Sykes, the only two officers he remembered "who got hurt in [his] years at UMES, other than Foster," were permitted to work light duty.  *Id.* ¶ 27.  Indeed, Defendant admitted that "[o]n occasion, UMES has agreed to light duty in . . . non-physical positions where the Worker's Compensation Insurer has requested this."  Def.'s Answers to Interrogs., Interrog. 22.  Also, although it is undisputed that "Foster's police officer licensure requires . . . 18 hours of training per year" and "[f]ailing to obtain training can lead to a license suspension or revocation," UMES did not allow Plaintiff to attend an in-service training during the time she was off duty, revoking the permission she previously had been granted and giving Plaintiff only one day's notice of the revocation.  Compl. ¶¶ 86–89; *see* Pl.'s Decl. ¶ 26.  By way of explanation, Billie stated that "[p]olice officers at UMES are not allowed to return to work until they are fully capable of performing all job functions," Billie Aff. ¶ 7, but it is not clear that attending training is equivalent to returning to work.[4]  It also is undisputed that Plaintiff's schedule was changed in a way that Plaintiff perceived as disadvantageous to her.  Compl. ¶¶ 59 & 66; Def.'s Reply 18.  However, the parties also agree that, on at least one occasion "Chief

---

[4] Although Plaintiff also alleges that Wright refused to sign a tuition remission form that Plaintiff submitted, even though he had signed the form "for several other similarly situated employees," Compl. ¶¶ 60–63, Plaintiff offers no evidence in support of her assertion, and "Defendant denies that [Wright] ever refused to sign a tuition form.  UMES has no record that Plaintiff ever submitted a tuition remission form for Chief Wright's signature."  Def.'s Answers to Interrogs., Interrog. 19.

Wright directed Officer Shrieves to change Officer Foster's schedule back to its original state." Def.'s Reply 19; *see* Pl.'s Opp'n 42.  A reasonable jury could find that these instances in which Defendant made it more difficult for Plaintiff to work and attend training constitute "'retaliatory animus'" that could show causation. *Westmoreland*, 2012 WL 2446154, at *10 (quoting *Lettieri*, 478 F.3d at 650).

While perhaps Plaintiff does not make the strongest claim of retaliation, and although the jury ultimately may reject her claim, these incidents provide sufficient evidence of "retaliatory animus" to generate a jury question regarding whether Plaintiff's termination was causally related to her engaging in the protected activity of complaining about Jones's behavior. *See Westmoreland*, 2012 WL 2446154, at *15.

### 2. Legitimate Nondiscriminatory Reason

Defendant insists that UMES "had a legitimate nondiscriminatory interest in rejecting Officer Foster on probation," namely, that the UMES Department of Public Safety "required more flexibility than police jobs at large agencies," yet "[o]n at least one occasion, Officer Foster was not available to cover a vacant shift," and she was absent frequently.  Def.'s Mem. 20–21. Defendant insists that "[t]he wealth of evidence supporting UMES's [legitimate nondiscriminatory] interest is so strong that it undermines any argument of pretext," such that summary judgment is appropriate on the retaliation claim, even if Plaintiff makes out a *prima facie* claim for retaliation.  *Id.* at 21.

Plaintiff concedes that her alleged refusal to switch shifts, frequent absences, and questionable "'commitment to the job' . . . could theoretically amount to a legitimate reason [for termination], if there were evidence to support it."  Pl.'s Opp'n 37.  Yet, in Plaintiff's view, Defendant "fails to point to any competent evidence whatsoever that could support a contention

that this was the cause of Foster losing her job." *Id.* at 37–38.  Plaintiff contends that the only supporting evidence Defendant provides is "the inadmissible conclusion of a hearing officer of unknown credential." *Id.* at 38.

Defendant does rely, in part, on the OAH Decision issued March 25, 2008.  *See* Def.'s Mem. Ex. 4.  Plaintiff does not cite any authority for her assertion that the hearing officer's conclusion is inadmissible.   Indeed, the evidence is admissible because it falls under an exception to the hearsay rule; it constitutes "factual findings from a legally authorized investigation."   *See* Fed. R. Evd. 803(8)(A)(iii).   Moreover, Defendant provides additional evidence that Plaintiff was terminated because she was inflexible and did not work cooperatively with others in the department.

In support of its assertions, Defendant provides evidence that it terminated Plaintiff because "she was not a team player and was not a good fit for UMES." Mar. 25, 2008 OAH Decision 11; *see id.* at 13.  Specifically, Defendant demonstrates that Plaintiff refused to change her shift to cover for another officer; changed language on department forms without permission; and moved furniture without permission, creating safety issues.  Mar. 25, 2008 OAH Decision 13; *see* Billie Aff. ¶ 6 (same); Def.'s Answers to Interrogs., Interrog. 6.  Defendant also offers the testimony of a speaker identified only as Plaintiff's supervisor that on one occasion, Shrieves called Plaintiff on either her landline or her cell phone to ask her to come to work early but could not reach her and therefore had to have Plaintiff's supervisor cover the shift instead.  OAH Hr'g Trans. at 147–51, Def.'s Mem. Ex. 3, ECF No. 41-4.  Plaintiff's supervisor further testified that, when Plaintiff came to work that day, she refused to cover his shift, even though he had filled in for her when she could not be reached.  *Id.*  Also, Plaintiff's supervisor testified that flexibility in scheduling was necessary in the department.   *Id.* at 164:15–17; *see also id.* at 513:6–19

(unidentified speaker testified the same).  Moreover, Holden, the final decision maker, stated that Plaintiff "on multiple occasions refused to be flexible and stay when the UMES Police Department needed her to work before or beyond her scheduled work time off" and "took an inordinate amount of sick leave and personal leave for a new employee particularly when she [was] aware that the UMES Police Department was severally [*sic*] short staffed at the time of her hire."  Holden Aff. ¶ 6.  Holden said that he terminated Plaintiff in part because she "did not make the effort [he] expect of all [UMES] police officers," especially with regard to being flexible and "accommodat[ing] requests of [her] employer."  *Id.*  Billie declared that Plaintiff "had used almost all of her accrued sick leave and personal leave."  Billie Aff. ¶ 6.  Based on this evidence, I am satisfied that Defendant has "proffer[ed] evidence of a legitimate, non-discriminatory reason for the adverse employment action."  *Wright v. Sw. Airlines*, 319 Fed. App'x 232, 233 (4th Cir. 2009).

   *3.  Pretext*

   Because Defendant has shown a legitimate, non-discriminatory reason for terminating Plaintiff, the burden shifts back to Plaintiff "to prove by a preponderance of the evidence that the proffered reasons [for termination] were pretextual."  *Wright*, 319 Fed. App'x at 233.  Defendant argues that Plaintiff cannot establish pretext because the UMES Policy on Probation for Nonexempt Employees provides that "'[a]n appropriate administrator may separate an employee on original probation <u>without reason</u> at any time.'"  Def.'s Reply 19–20 (citing 182.0 VII-1.21 UMES Policy on Probation for Nonexempt Employees (July 12, 1996) (emphasis in Policy)).  Yet, the fact that an employee may be terminated without reason does not mean that the employee cannot show that the employer's stated reasons for termination were pretextual.  To do so, the employee "must point to facts that render the employer's reason so questionable as to

raise an inference of deceit." *Bryan v. Prince George's Cnty., Md.*, No. DKC-10-2452, 2011 WL 2650759, at *6 (D. Md. July 5, 2011).  Put another way, the employee must show that the employer's "explanation 'is unworthy of credence to the extent that it will permit the trier of fact to infer the ultimate fact of intentional discrimination.'"  *Id.* (quoting *Dugan v. Albermarle Cnty. Sch. Bd.*, 293 F.3d 716, 722 (4th Cir. 2002)).

Defendant's main reason for terminating Plaintiff was that Plaintiff's lack of flexibility made her ill-suited to be part of a small department where colleagues relied on each other to cover their shifts as necessary.  *See* Holden Aff. ¶ 6; Billie Aff. ¶ 6; Mar. 25, 2008 OAH Decision 11 & 13; Def.'s Answers to Interrogs., Interrog. 6.  Plaintiff provides evidence to the contrary, including Wright's deposition testimony admitting that there were no memos, documents, or anything else in Plaintiff's "personnel file that says she was inflexible about any particular scheduling issue," Wright Dep. 188:3– 189:19, Pl.'s Opp'n Ex. 12, ECF No. 43-12.  Additionally, Sykes said that, "[a]s her supervisor, [he] completely disagree[d] with any statement that Officer Foster was 'inflexible in her work schedule,'" and that, in any event, any scheduling difficulties with Foster were not grounds for termination.  Sykes Decl. ¶ 44.  Plaintiff also offers the Declaration of Officer Shrieves, who was responsible for scheduling, that "Officer Foster was always a team player; she came with experience and did her job with purpose and excellence," that she was not inflexible, and that "[e]verything Officer Foster tried to do was to better the department."  Shrives Decl. ¶¶ 17–18, 21 & 37, Pl.'s Opp'n Ex. 16, ECF No. 43-16.  Shrives stated that "Officer Foster was never difficult, demanding or rude in discussing scheduling issues with [him]."  *Id.* ¶ 27.  He also said that on occasion, "Officer Foster asked if she could remain on duty when she was called to work rather than go home."  *Id.* ¶ 29.  According to Plaintiff, "the record shows that Foster routinely stayed beyond her regular shift

working overtime," Pl.'s Opp'n 39, and Plaintiff's co-worker Shae Waters stated in her Declaration that Plaintiff worked overtime.  Waters Decl. ¶ 55, Pl.'s Opp'n Ex. 5, ECF No. 43-5. This evidence certainly generates a jury question as to whether Defendant's reason was pretextual, because it suggests that Plaintiff may not have been inflexible, or that her inflexibility was not such that it provided appropriate grounds for termination.

Plaintiff also presents evidence that calls into question whether Plaintiff's superiors were dissatisfied with her work performance.  Wright stated in May 2007 that Plaintiff "was working at a higher level than the other police officers."  Pl.'s Decl. ¶ 12.  Her immediate supervisor, Sykes, declared that "Foster was doing a good job," Sykes Decl. ¶ 33, and that he "had no problems with her and not once had to write her up, she always came to work, and she fit right in with what [the department was] trying to do," *id.* ¶ 61.  Moreover, Wright and Sykes "discussed promoting her to corporal before she made her sexual harassment complaint."  *Id.* ¶ 62. Additionally, Plaintiff demonstrates that the changes she made to the departmental forms and her rearrangement of the furniture did not displease her superiors.  To the contrary, Sykes stated that "Chief Wright wanted the forms revised and praised the results."  *Id.* ¶ 50.  And, according to Sykes, "Chief Wright never showed any displeasure with the furniture rearrangement . . . ." [5]  *Id.* ¶ 51.

---

[5] Plaintiff also argues that the timing of her termination "suggest[s] pretext" because her termination followed her complaint to Billie on September 28, 2007, even though "Wright knows of no scheduling inflexibility in September 2007 or thereafter . . . [and] cannot recall if Foster had performance problems in September."  Pl.'s Opp'n 42.  However, Wright testified that he recommended her termination on October 24, 2007, after observing around that time "all the injuries, the high absenteeism rate, inflexibility working, not being a team player."  Wright Dep. 197:13–21, 200:18–21.

Additionally, Plaintiff contends that Billie's bias, changed testimony, and loss of documents suggest pretext.  Pl.'s Opp'n 44–50.  Specifically, she notes that Billie first concluded that Jones sexually harassed Plaintiff, yet later "testif[ied] that she never found that Jones sexually harassed Foster."  Pl.'s Opp'n 45–46.  However, Defendant explained that Billie's initial

Through this evidence, Plaintiff "render[s] the employer's reason so questionable as to raise an inference of deceit." *Bryan*, 2011 WL 2650759, at \*6; *see Dugan*, 293 F.3d at 722. Thus, a reasonable jury could conclude that "the proffered reasons [for termination] were pretextual." *Wright*, 319 Fed. App'x at 233.   Plaintiff's retaliation claim ultimately may be a close call because Plaintiff's evidence, while sufficient to generate a jury question on pretext, is somewhat lacking.   Nonetheless, summary judgment is not appropriate on this claim.

## IV.   CONCLUSION

In sum, Defendant's Motion for Summary Judgment is GRANTED as to Count I, "Hostile Environment and Termination Based on Gender in Violation of Title VII . . . of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq.," and DENIED as to Count II, "Retaliatory Harassment and Termination for Activities Protected by Title VII."

---

conclusion was based on the UMES policy against sexual harassment, which is not necessarily "actionable sexual harassment under Title VII," such that Billie's conclusion did not constitute a finding that Jones sexually harassed Plaintiff for purposes of a Title VII claim.  Def.'s Reply 11.

According to Plaintiff, there was spoliation of evidence when "Billie . . . lost the critical notes to her Jones, Foster and Waters interviews." Pl.'s Opp'n 49.  She contends that summary judgment should be denied because the "lost" evidence "could well have provided powerful impeachment evidence . . . . and demonstrated [Billie's] own bias and even destroyed her credibility." *Id.* at 50.  Spoliation is the "'destruction or material alteration of evidence or . . . the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 515–16 (D. Md. 2010). To establish spoliation, Plaintiff must show that

> (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a culpable state of mind; and (3) the evidence that was destroyed or altered was relevant to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 509 (D. Md. 2009).  There is no evidence before me that establishes these elements of a spoliation claim.

So ordered.

Dated: <u>December 4, 2012</u>                                            <u>          /S/          </u>
                                                                          Paul W. Grimm
                                                                          United States Magistrate Judge

lyb